# EXHIBIT B

Filing # 101657215 E-Filed 01/14/2020 05:11:32 PM

IN THE CIRCUIT COURT OF THE
15TH JUDICIAL CIRCUIT IN AND
FOR PALM BEACH COUNTY, FLORIDA

CIVIL DIVISION

CASE NO.

CRAIG ROBERTS and BEVERLY ROBERTS,

      Plaintiffs,

vs.

DONALD CLIFFORD; BRIAN BRESCIA; and
GERARDO M. BALBONI, II,

      Defendants.

_____/

## COMPLAINT

    Plaintiffs Craig Roberts and Beverly Roberts ("**Plaintiffs**"), sue Defendants Donald
Clifford a/k/a Don Clifford ("**Clifford**"), Brian Brescia ("**Brescia**"), and Gerardo M. Balboni, II
("**Balboni**") (collectively the "**Defendants**"), and allege the following:

## NATURE OF THE ACTION

    1.    Plaintiffs seek to recover damages stemming from the tortious, unlawful and
improper conduct of the Defendants in connection with a merger between GrowHealthy
Holdings, LLC, GrowHealthy Farms Florida, LLC, McCrory's Sunny Hill Nursery, LLC and
GrowHealthy Merger Co. Inc. (collectively "**GHH**"),[1] on the one hand, and iAnthus Capital
Holdings, Inc., iAnthus Capital Management, LLC, and iAnthus Merger Sub, LLC (collectively
"**iAnthus**") on the other (the "**Merger**").

---

[1]    Prior to the Merger, GHH was the parent company of GrowHealthy Farms Florida, LLC
("**GH Farms**"), McCrory's Sunny Hill Nursery, LLC ("**McCrory's**"), and GrowHealthy
Properties, LLC ("**GH Properties**"). GH Farms, which prior to the Merger was wholly owned
by GrowHealthy Holdings, LLC, also owned 75% of the outstanding interests of McCrory's.

1

51512998;1

2.     As set forth more fully below, the disclosures made to Plaintiffs regarding the Merger were woefully inadequate.   Specifically, Defendants misrepresented and failed to disclose (i) the specific number of iAnthus shares that each GHH shareholder, including Plaintiffs, would receive as a result of the Merger, and (ii) the equivalent cash value that each shareholder, including Plaintiffs, would receive after closing.   Accordingly, at the time of the shareholder vote to approve the merger, Plaintiffs and all other shareholders were uninformed regarding the value of the consideration they would receive after the Merger.

3.     Brescia and Clifford (GHH's managers, at various times) and Balboni (GHH's long time corporate counsel) collectively exercised control over GHH.   Together, they conspired to use GHH as their own personal fiefdom, routinely acting for their own personal benefit and without regard to the consequences their actions would have on GHH or its shareholders. Indeed, Brescia, Clifford and Balboni conspired to, among other things, promote the Merger and ensure that it closed because they would each directly benefit, despite that they knew that (i) the Merger was not in the best interests of GHH shareholders, (ii) GHH shareholders, including Plaintiffs, would receive much less cash consideration as a result of the Merger than was promised, (iii) they had conducted no due diligence on behalf of GHH, despite being tasked with doing so, regarding iAnthus, and (iv) the shareholder vote in October 2017, by which GHH shareholders allegedly approved the Merger, was procured by false and misleading statements made by them in the Shareholder Package.

4.     Clifford also cashed in a portion of his founding shares (which he received without investing a single dollar of his own money), pre-Merger, for $1,500,000 (and at the *full* share conversion price of $1.02/share, 20% more than all other GHH shareholders). Clifford pushed the deal forward for his own personal benefit contrary to the adverse impacts to Plaintiffs

2

and other GHH shareholders.  The Merger was Clifford's exit strategy and his retirement plan. He saw the iAnthus deal as an opportunity to make millions of dollars and retire, knowing that the implementation of his exit strategy would materially hurt GHH and its shareholders, to whom he owed a fiduciary duty.

5.      Brescia, Clifford and Balboni directly misled shareholders and failed to adequately disclose that, as a result of the Merger, Plaintiffs and GHH shareholders would see a significant reduction in the consideration they received as a result of the Merger.

6.      As shareholders of GHH, being asked to make a decision regarding whether to approve the Merger, Plaintiffs were entitled to full and accurate disclosure pertaining to any and all proposed terms of any such transactions, including but not limited to, what Plaintiffs would receive as consideration after consummation of the Merger.[2]  This did not occur, and Plaintiffs were damaged as a result in the form of a 20% dilution to the merger consideration they received.

## THE PARTIES (AND RELEVANT NON-PARTIES)

7.      At all times material hereto, Plaintiffs were shareholders of GHH and were residents of Palm Beach County, Florida.

8.      Clifford is a resident of the state of Georgia, and at all times material hereto up to and including December 31, 2017, was the Chief Operating Officer and manager of GHH. Clifford regularly conducted business on behalf of GHH in Palm Beach County, Florida.

---

[2]      Upon information and belief, certain GHH board members were also not aware of (i) the specific number of iAnthus shares that they would receive as a result of the Merger, and (ii) the equivalent cash value that they would receive after closing.  Indeed, it appears that this important information was also not disclosed to certain board members prior to the consummation of the Merger.  This further illustrates that Brescia, Clifford and Balboni hid details not only from GHH shareholders, but even from board members, in an effort to further their own interests.

3

9.     Brescia is a resident of the state of Florida, and from January 1, 2018 to present, has been the manager of GHH.  Brescia regularly conducted business on behalf of GHH in Palm Beach County, Florida.

10.     Balboni is a resident of the state of Georgia, and at all times material hereto, was the attorney who represented GHH long before, during, in connection with, and after the Merger. Balboni regularly conducted business on behalf of GHH in Palm Beach County, Florida.

11.     GHH is a Delaware limited liability company with its principal place of business in Palm Beach County, Florida.

12.     iAnthus is a publicly traded Canadian Company (trading on the Canadian Securities Exchange under the symbol IAN and on the OTCQB under the symbol ITHUF) that invests in cannabis cultivators, processors and dispensaries throughout the United States. iAnthus also has employees in and maintains an office in Palm Beach County, Florida, and throughout the country.

## JURISDICTION AND VENUE

13.     This is an action for damages in excess of $30,000.00 exclusive of interest, attorneys' fees and costs.

14.     This Court has jurisdiction over this action, *inter alia*, pursuant to Section 48.193, Florida Statutes.

15.     This Court has personal jurisdiction over each defendant named herein, and due process is satisfied, because defendants have, at all times relevant to this action, individually or through their agents, subsidiaries, parent, officers, directors, and/or representatives: (a) operated, conducted, engaged in or carried on a business venture and/or commercial activities in this State; (b) maintained an office or agency in this State; (c) committed tortious conduct within this State

4

related to the allegations made in this Complaint; and (d) proximately caused injuries to Plaintiffs arising out of the actions, inactions, conduct, statements, or omissions complained of herein, which occurred in the State of Florida and in Palm Beach County, Florida.

16.    Further, Defendants have sufficient minimum contacts with Florida so as to render the exercise of jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.

17.    Venue is proper in this Court, *inter alia*, pursuant to Section 47.051, Florida Statutes, because much of the conduct complained of herein and/or all causes of action took place or accrued in, or emanated from, Palm Beach County, Florida.

<u>**GENERAL ALLEGATIONS**</u>

18.    GHH was formed in 2014.

19.    Clifford was one of three original founders of GHH.  The other founders were Craig Roberts and Beverly Roberts.  Each original founder was given 3,900,000 shares of GHH stock ("**Founding Shares**"), which at the time represented for each a 10% interest in GHH.

20.    Clifford was the manager of GHH from its inception through December 31, 2017. As the manager, Clifford had substantial discretion to manage and control over the affairs of GHH.  But, in furtherance of pushing his own private agenda, with assistance and private advice, direction from, and conspiring acts with Balboni, Clifford strategically compiled a board of directors, the majority of whom failed to exercise independent judgment but would routinely vote with Clifford on matters affecting GHH.  Over time, it became clear that Clifford's goal was to use his power and influence over the Board and his clout as Manager to further his own financial and other interests.  As explained below, he did exactly that, *inter alia*, in making material misstatements regarding the Merger to shareholders like Plaintiffs.

51512998;1

21.     In 2017, Clifford no longer sought to operate GHH for the benefit of its shareholders.  Instead, he began focusing his time and energy on strangling the financial viability of GHH, and then, with a fiscally weakened GHH, finding a buyer for GHH to then "save the company" so that he could sell his Founding Shares (which he did not pay for) at a premium. This was Clifford's retirement and exit strategy.

22.     In or around the summer of 2017, without announcing same to the Board or any GHH shareholder, Clifford secretly met with representatives of iAnthus in New York.

23.     In the meantime, GHH's other shareholders, including Plaintiffs, were attempting to attract new investors.  However, Clifford routinely denied Plaintiffs and those shareholders access to GHH's facilities and its corporate information, so as to keep the focus on doing a deal with iAnthus, which would benefit Clifford.  In stark contrast, representatives of iAnthus were given full and unfettered access to the GHH's facilities and its corporate information.  Clifford was determined to push a deal with iAnthus forward despite having failed to conduct any reasonable diligence regarding iAnthus.

24.     On August 7, 2017, at Clifford's direction GHH and iAnthus entered into a Summary of Terms (the "**Initial Term Sheet**").

25.     On September 14, 2017, Plaintiffs received an e-mail from Clifford stating that GHH entered into "exclusive negotiations with iAnthus" and urged Plaintiffs to become familiar with iAnthus and its leadership team.  The exclusivity given to iAnthus furthered Clifford's goal of precluding competing investment into GHH, by anyone other than iAnthus.

26.     No mention was made of a proposed merger with, or a sale of substantially all of GHH's assets to, iAnthus in the September 14, 2017 e-mail from Clifford, despite that, on the same date, GHH entered into an Amended Restated Summary of Terms ("**Amended Term**

51512998;1

**Sheet**") with iAnthus, which "outline[d] the principal terms and conditions of the proposed acquisition by [iAnthus] of [GHH]."

27.    Clifford signed the Amended Term Sheet on behalf of all GHH entities, with the approval and concurrence of Balboni and Brescia.

28.    Among many other things, pursuant to the Amended Term Sheet, in order for any deal between GHH and iAnthus to come to fruition, (i) the GHH Board was required to approve the transactions, and (ii) GHH was required to obtain any and all consents required from the Florida Department of Health to transfer GHH's Medical Marijuana MMTC License to iAnthus.

29.    But, at the time of execution of the Amended Term Sheet, neither Clifford nor GHH had conducted any due diligence regarding whether the Florida Department of Health would approve the transfer of the MMTC License to iAnthus, or otherwise approve of the contemplated transactions. These failures by Clifford, Balboni and Brescia put the MMTC License, GHH's most valuable asset, in jeopardy. If Clifford had conducted any diligence in this regard, the results were not shared with Plaintiffs or GHH shareholders before they were forced to vote on the contemplated transactions on October 10, 2017. This information clearly was material to Plaintiffs and the GHH shareholders, and was required to be disclosed in fulfillment of the obligations owed by the Defendants to the Plaintiffs.

30.    At a subsequent Board meeting on September 24, 2017, GHH Board members were advised by Balboni that, "if any Board member wanted to submit documents or a written statement concerning opposition to the proposed transactions with [iAnthus] they would have to be timely delivered *in order to be included in the descriptive materials of the proposed transactions which would be sent out September 30, 2017*." (emphasis added).

31.     The minutes also reflect that "Craig Roberts stated that he disagreed with the proposed transactions with iAnthus and introduced his written statement opposing the transaction, which is attached to these minutes as Attachment 1." *Id.* Craig Roberts' statement in opposition to the contemplated transactions states, in pertinent part:

> After reviewing the iAnthus financials for the first time this week… its clear iAnthus does not have the estimated $17.5 million in cash needed to close… iAnthus reports it actually lost nearly $4.5 million in the first 6 months of 2017, has some $8 million in cash and heavy debt… there is absolutely no documented evidence that iAnthus can invest, as claimed, an additional $20-30 million to expand… our operations in Florida.  That additional investment is critical to honor our commitment to the State, to protect our [MMTC] License and to benefit our trusting investors and future patients… also most concerning… iAnthus could lose its ability to [trade its shares publicly]…  Based on the previously unseen iAnthus financial data and other factors, it's no secret, and I have repeatedly told attorney Balboni and so advised the Board, *I now believe the proposed iAnthus transaction and merger are not in the best interest of all GrowHealthy shareholders… I believe [the deal is also] staged to financially benefit th[e GHH] Board of Directors at the expense of other trusting [GHH] shareholders who we have a fiduciary duty to protect.*

*Id.* (emphasis added).

32.     Craig Roberts' statement in opposition to the Merger was not included in any written disclosure to GHH shareholders, despite that, pursuant to Balboni's instruction, it would be.

33.     On September 30, 2017, Clifford, as Manager and CEO of GHH, and on behalf of the GHH Board, sent a *Notice of Special Meeting of Shareholders and Memorandum to*

8

*Shareholders* (the "**Shareholder Package**") to all GHH shareholders.[3]  A true and correct copy

of the Shareholder Package is attached hereto as **Exhibit A.**

34.     The Shareholder Package purported to invite all GHH shareholders to a special

meeting to take place on October 10, 2017 in West Palm Beach, Florida, to consider and approve

the contemplated transactions with iAnthus.  *See* Ex. A p. 2.

35.     A review of the Shareholder Package itself makes clear that the terms of the

contemplated transactions between GHH and iAnthus were not fully disclosed to Plaintiff and

other GHH shareholders.

36.     For example, despite that it was <u>required</u> to be included, the Shareholder Package

did not include Craig Roberts' statement in opposition to the contemplated transactions.

Clifford's and GHH's failure to include the statement in opposition is even more egregious in

light of the fact that the introductory note to the shareholders states that "The Board of Directors

recommends a vote 'FOR' the matters being voted on."  *Id.*  The introductory page also provides,

in **BOLD AND CAPITALIZED** font that, "the Board of Directors of [GHH] has approved the

terms of the proposed transactions and recommends that [GHH's] shareholders vote in favor of

the proposed transactions at the special meeting of the shareholders on October 10, 2017."  *See*

Ex. A, p. 2.

37.     Obviously, this statement was false, and therefore misleading to GHH

shareholders, as Craig Roberts and Beverly Roberts, who at the time were GHH Board members,

flatly opposed the contemplated transactions.  This information should have been disclosed to

GHH shareholders so as to prevent an uninformed shareholder vote.  Indeed, governing law

---

[3]     The Shareholder Package was dated September 29, 2017, but it was not actually sent to
GHH shareholders until September 30, 2017.  In addition, the Memorandum to Shareholders
purports to claim that it was "of record on September 27, 2017," which is also untrue.

requires that Clifford provide GHH shareholders with a fair summary of the negotiation history surrounding the deal. Clifford and Balboni failed in this regard and actively concealed material information from the GHH shareholders.

38.     Moreover, Clifford took absolutely no steps to investigate or otherwise conduct due diligence regarding Craig Roberts and Beverly Roberts' concerns with the contemplated transactions, as he should have, nor did Brescia or Balboni. Clifford also did not appoint an independent committee of legal, accounting, or industry experts to investigate the expressed concerns and objections to the contemplated transactions.

39.     The disclosures provided to Plaintiffs and other GHH shareholders in the Shareholder Package were patently insufficient and inadequate. The Shareholder Package was authored and approved by Balboni and Clifford and Brescia. It was then mailed to all shareholders before the October 10, 2017 shareholder vote.

40.     Balboni, Brescia, and Clifford all knew that Craig Roberts's statement opposing Merger was not included in the Shareholder Package, and should have been. They also knew that the Shareholder Package contained materially false information, in that it stated that the entire Board of Directors voiced approval for the Merger, which was untrue.

41.     Most importantly, all shareholders, including Plaintiffs, were misled regarding the consideration they would receive after consummation of the Merger ("**Merger Consideration**").

42.     The Shareholder Package states that GHH intended to use up to $9 million of the cash proceeds to fund the redemption of shares (at roughly $1.02/share) of GHH held by shareholders who had the right to designate a board member under GHH's LLC Agreement. These shareholders (with the right to designate a board member) collectively owned 67.48% of all outstanding GHH shares. *See* Shareholder Package, p. 14.

51512998;1

43.     Clifford was one such shareholder, and thus, benefited from his status to obtain the roughly $1.02/share in the directed redemption before the Merger closed, as opposed to the roughly $0.82/share that other shareholders ended up receiving after the Merger.

44.     The Shareholder Package also stated that, as a result of the Merger, GHH would receive at least $30.5 million from iAnthus payable to GHH in shares of common stock of iAnthus.  *See* Shareholder Package, p. 6.

45.     The Shareholder Package also did not, however, disclose how many of the 67.48% of GHH shares were actually being redeemed, such that a GHH shareholder (like Plaintiffs) being forced to vote on the proposed Merger could not figure out the remaining balance of shares to be split up by shareholders accounting for the remaining $30.5 million worth of iAnthus stock.

46.     The Shareholder Package also described that, in connection with the proposed Merger, GHH would make a tender offer to redeem up to 5,850,005 GHH shares from shareholders of GHH (with certain exclusions). However, at the time of the vote, there were nearly 50 million shares of GHH outstanding. Yet, the Shareholder Package did not detail what would happen if the tender offer was oversubscribed, and what effect it would have on the remaining shares and the consideration associated with same. *See* Shareholder Package, p. 7.

47.     One thing that *was* made clear (albeit, knowingly falsely) by Clifford, Brescia and Balboni was that GHH shareholders should expect to receive roughly $1.02/share as a result of the Merger as consideration.

48.     The meeting of GHH shareholders took place in West Palm Beach, Florida, on October 10, 2017.  This was the first and only GHH shareholder meeting that Clifford ever called during his tenure as GHH manager.

49.     Importantly, Clifford, Brescia and Balboni knew that there were significant issues regarding the inadequacies of the disclosures to shareholders.  Thus, prior to the shareholder vote, Clifford, Brescia and Balboni solicited *irrevocable* proxies from enough GHH shareholders to lock in an approval of the Merger.

50.     In large part, the shareholders who gave irrevocable proxies were called privately by Brescia, Clifford or Balboni before the October 10, 2017 vote.  The proxies were garnered by misrepresentations regarding the terms of the deal (including, *inter alia*, that the entire GHH Board, including Craig Roberts (who was responsible for attracting most of the GHH shareholders to GHH in the first place) was in favor of the Merger, which was not true). It is clear that these irrevocable proxies were obtained by Clifford, Brescia and Balboni under false pretenses.

51.     Nevertheless, going into the shareholder vote, Clifford, Balboni and Brescia had acted in concert to assure that the Merger would be approved, despite all of its inadequacies and deficiencies.

52.     If GHH shareholders had known that Craig Roberts opposed the Merger, they would not have given Clifford, Brescia and/or Balboni their irrevocable proxies in favor of the Merger.

53.     Despite all of the shortcomings, deficiencies, deceptions and inadequacies related to the disclosures regarding the Merger, and because of Brescia, Clifford and Balboni's misrepresentations regarding the terms of the Merger, shareholders voted to approve the proposed Merger.

54.     This was despite that the terms of these proposed transactions were not finalized at the time of the shareholder vote, as the terms were still very much in flux.

55.     Indeed, the Shareholder Package did not even include a proposed merger agreement (or specify any terms, for that matter).  Rather, on Page 5 of the Shareholder Package, there is a link to only *one* of the *draft* agreements necessary to effectuate the entire Merger transaction (the GHH Mergerco Merger Agreement).  As is apparent from the face of the GHH Board Resolutions, the Board merely resolved to adopt another agreement "in the form comparable to the GHH Mergerco Merger Agreement."  Thus, shareholders were not given *any* materials to review involving the details of the GHH Management Merger Agreement.

56.     No transactions could have been properly voted on under governing law because the terms of the contemplated transactions were in flux.

57.     This point is made clear by the language of the Shareholder Package itself.  Indeed, the only mention of an actual agreement in the Shareholder Package emphasizes that the proposed agreement is merely a draft, subject to revision.  It provides:

> THE FOLLOWING SUMMARY OF TERMS IS QUALIFIED IN ITS ENTIRETY BY THE *CURRENT DRAFTS* OF THE REAL ESTATE PURCHASE AGREEMENT AND THE FIRST MERGER AGREEMENT COPIES OF WHICH ARE AVAILABLE HERE AND HERE, RESPECTIVELY. *THESE DRAFTS ARE SUBJECT TO REVISION.*

*See* Shareholder Package, p. 5 (footnotes omitted) (emphasis added).

58.     Moreover, the Resolutions adopted by the Board specifically acknowledge that, in order to finalize the merger, *additional documents* will need to be drafted and submitted to GHH shareholders for vote at a later date.

59.     Plaintiffs and other shareholders were also left unaware of what, if any, dissenting shareholder's options were available with respect to the proposed merger, as the Shareholder Package was silent on this point.  There was no mention of whether such a dissenting shareholder would be entitled to appraisal rights or other relief.  Similarly, the Shareholder

13

Package was silent on the consequences of a dissenting shareholder's refusal to sign the merger agreement, when presented. Without such information, Plaintiffs and other shareholders were unable to adequately assess their options with respect to the Merger and, indeed, were misled to believe there were no viable options to the blind approval of a still undefined merger.

60.     Clifford also withheld from GHH shareholders the relevant history surrounding GHH's negotiations with iAnthus.  Not only did Clifford fail to provide the opposition statement prepared by Craig Roberts (as required), but he failed to detail the Board's internal deliberations regarding whether the proposed merger was in the best interests of GHH and its shareholders, instead including a note to shareholders that the Board was generally in favor of the merger. Clifford did not provide any basis as to why he recommended the Merger in lieu of staying independent, or pursuing other investment strategies to further GHH's business.   This information would have been valuable to Plaintiffs and other GHH shareholders in considering whether to vote in favor of the Merger.

61.     The Shareholder Package also instructed that prior to closing of the deal, all holders of GHH shares "*must* execute and deliver a Shareholder Representative Agreement… *which will be circulated to the shareholders at a later date.*"  *Id.* at p. 8 (emphasis added). The Shareholder Representative Agreement ("**SRA**") was delivered to shareholders, including Plaintiffs, on November 22, 2017, long after the shareholder vote.

62.     The Shareholder Package made no mention of the fact that the Shareholder Representative Agreement would require shareholders, like Plaintiffs, to agree to broad, and previously undisclosed, indemnification, waiver and releases – *in order to receive any* Merger consideration.

14

63.     Despite all of the foregoing deficiencies, Plaintiffs (like all other shareholders) were forced to vote one way or another.

64.     As of December 31, 2017, Clifford resigned from the GHH Board and as manager of GHH. Amazingly, just before his resignation, the GHH Board approved a $250,000 severance to Clifford, despite that GHH was short on cash.  This undeserved payout to Clifford was championed by Brescia, Balboni and Clifford himself.

65.     Clifford was replaced by Brescia, and Brescia became the Manager of GHH effective January 1, 2018.

66.     The Merger closed, behind closed doors and in secret, on January 16, 2018.

**Failure to Disclose and Misrepresentations Regarding Merger Consideration Details**

67.     Among the many inadequacies and deficiencies surrounding the disclosures to Plaintiffs and other shareholders regarding the Merger, the most significant was the failure to disclose: (i) the specific number of iAnthus shares that each shareholder, including Plaintiffs, would receive as a result of the Merger, and (ii) the equivalent cash value that each shareholder, including Plaintiffs, would receive after closing.

68.     Specifically, as proposed, the Merger was based on a consideration amount of $30,500,000.00 in iAnthus stock and $17,500,000.00 in cash.  At the time, there were 46,786,533 outstanding shares of GHH.  By dividing the total consideration to be paid by iAnthus at closing ($48,000,000.00) by the number of outstanding shares, the consideration amount for Plaintiffs and GHH shareholders after the merger was thought (and represented by Clifford, Brescia and Balboni) to be $1.02594 per share.  These figures were confirmed in writing by Balboni in a post-closing January 22, 2018 e-mail, wherein he tried to explain around the very issue in this

15

litigation – why there was a dilution of the cash consideration owed to Plaintiffs and GHH shareholders.

69.     In short, without notifying Plaintiffs and other shareholders, Brescia, with the assistance of Balboni, took certain actions that diluted the value of the cash consideration that Plaintiffs and other shareholders were set to receive as a result of the Merger.

70.     In the words of Balboni, the Board decided "to take $15,000,000.00 of the cash and pay it to shareholders." In so doing, Defendants "computed the 'value' of the deal in iAnthus stock [using] the $30,500,000.00 of the stock consideration [only], not the value of the entire deal," i.e., not $48,000,000.00. *Id.*

71.     Moreover, Balboni admits that, in order to close the Merger, Defendants issued additional shares of GHH stock, as follows, which further diluted the value of the cash consideration to be received by Plaintiffs and other GHH shareholders from the original value of $1.02594 to roughly $0.82 per share:

      (a)     27,981 shares were issued for cash at $1.02564;

      (b)     4,473,392 shares were issued to:

            (i)     Darrin Potter for his interest in GH Farms;

            (ii)    Dolores and Ward McCrory for their interests in McCrory's;

            (iii)   Peckett's, Inc. for its interests in McCrory's;

            (iv)    AgriStarts, Inc. for its interests in McCrory's; and

            (v)     Eve's Garden, Inc. for its interests in McCrory's; and

      (c)     234,000 shares issued to HarryMax Consulting, LLC, as a finder's fee.

*Id.*

72.    Not surprisingly, HarryMax Consulting, LLC is an entity owned and operated by Brescia's personal friend.   Entry into the "finder's fee" contract with HarryMax was not disclosed to or approved by anyone at GHH.   The finder's fees of 234,000 shares of GHH was significant consideration, which as discussed above, resulted in a dilution to Plaintiffs and GHH shareholders' consideration.   This is yet another example of Brescia looking out for himself and his circle of colleagues and friends, to the detriment of Plaintiffs and GHH shareholders.

73.    None of the foregoing was disclosed to Plaintiffs or other GHH shareholders, nor was the fact that the issuance of these extra shares in connection with the Merger would significantly dilute the cash consideration that Plaintiffs and other GHH shareholders would receive after the Merger, by approximately 20%.

74.    In an e-mail dated January 29, 2018, Balboni attempted to explain the situation to a GHH shareholder.   Balboni stated that **"the [B]oard and management were aware that … [the Merger] would not return a full $1.02 per share**." (emphasis added).

75.    Balboni stated "the transaction was structured on the assumption that the iAnthus stock price would increase post-closing[4]… and provide a return on investment that would provide the hoped for profit when the investment was originally made." *Id*.  In fact, Balboni even represented that he "liked the deal so much that if it closed, he was going to buy shares to invest in iAnthus for himself." *Id*.

76.    Tellingly, as is the case with Plaintiffs here, that shareholder responded to Balboni stating that he was "unaware that the value would not be fully realized." *Id*.

---

[4]    In fact, the iAnthus stock price is currently near all-time lows.

77. The Shareholder Package did not disclose these key facts, nor was this information disclosed at the meeting on October 10, 2017, despite that representatives of iAnthus, Clifford, Balboni, and, Brescia were all present at the meeting.

78. Plaintiffs and other shareholders were harmed as a result of the Defendants' conduct because based on the dilution, they did not receive the full amount of the consideration due to them in the amount of the $1.02594/share that was falsely represented by Defendants in connection with the Merger.

79. Clifford and Brescia's fiduciary duties to Plaintiffs included an obligation to use reasonable care in presenting a recommendation for stockholder action and in gathering and disseminating accurate and complete information in connection with that recommendation.

80. Specifically, among these duties was a duty of candor to disclose all material information to shareholders, including Plaintiffs, which Brescia and Clifford each breached.

81. Prior to the Merger, Plaintiffs owned a combined total of approximately 11,472,244 shares of GHH.

82. Plaintiffs have retained the undersigned counsel to prosecute its interests in this action, and Plaintiffs are entitled to recover their reasonable attorneys' fees and costs incurred in prosecuting this action against Defendants, as applicable.

## COUNT I
### – FRAUD –
**(Against Clifford)**

83. Plaintiffs re-assert and re-allege the allegations of Paragraphs 1 through 82 above and specifically incorporate said allegations herein.

84. Clifford repeatedly represented to Plaintiffs, that the proposed and contemplated transactions with iAnthus were in the best interests of Plaintiffs and GHH shareholders.

18

85.     Furthermore, at all times material hereto, between August 2017 and the closing of the Merger, Clifford represented to Plaintiffs that the Merger would result in a conversion ratio of $1.02/share of GHH stock, well-knowing at the time that the representation was false.

86.     Clifford authored and authorized the distribution of the inadequate and legally deficient Shareholder Package, which disseminated to Plaintiffs and GHH shareholders false, misleading, deceptive and incomplete information regarding the Merger with iAnthus, including specifically, the consideration amount and structure.

87.     Clifford knew the representations to be false, and knew that Plaintiffs would rely on the representations.

88.     Plaintiffs relied on these representations by Clifford to their detriment, and have been damaged as a result – as Plaintiffs' Merger consideration was diluted by 20% of its value.

<u>COUNT II</u>
– FRAUD –
(Against Brescia)

89.     Plaintiffs re-assert and re-allege the allegations of Paragraphs 1 through 82 above and specifically incorporate said allegations herein.

90.     Brescia repeatedly represented to Plaintiffs, that the proposed and contemplated transactions with iAnthus were in the best interests of Plaintiffs and GHH shareholders.

91.     Furthermore, at all times material hereto, between August 2017 and the closing of the Merger, Brescia represented to Plaintiffs that the Merger would result in a conversion ratio of $1.02/share of GHH stock, well-knowing at the time that representation to be false.

92.     Brescia authored and authorized the distribution of the inadequate and legally deficient Shareholder Package, which disseminated to Plaintiffs and GHH shareholders false,

misleading, deceptive and incomplete information regarding the Merger with iAnthus, including specifically, the consideration amount and structure.

93.     Brescia knew the representations to be false, and knew that Plaintiffs would rely on the representations.

94.     Plaintiffs relied on these representations by Brescia to their detriment, and have been damaged as a result – as Plaintiffs' Merger consideration was diluted by 20% of its value.

**COUNT III**
**– Breach of Fiduciary Duty –**
**(Against Clifford)**

95.     Plaintiffs re-assert and re-allege the allegations of Paragraphs 1 through 82 above and specifically incorporate said allegations herein.

96.     Clifford, as the CEO and Manager, and as a director of GHH, owed Plaintiffs various fiduciary duties, including the duties of care, loyalty, good faith, and full disclosure.

97.     Clifford breached his fiduciary duties to Plaintiffs by authoring and authorizing the distribution of the inadequate and legally deficient Shareholder Package, which disseminated to Plaintiffs and GHH shareholders false, misleading, deceptive and incomplete information regarding the Merger with iAnthus, including specifically, the consideration amount and structure, as described more fully above.

98.     In addition to the breaches set forth above, Clifford breached his fiduciary duties of loyalty, care, good faith, and full disclosure owed to Plaintiffs in allowing Plaintiffs (and other GHH shareholders) to vote on a transaction that was not finalized, which harmed Plaintiffs because as a direct result of these breaches, Plaintiffs and other shareholders received roughly 20% less consideration as a result of the Merger than it should have received.

20

99.     As a result, Clifford was able to secure a better deal for himself (i.e., a higher conversion price for his shares) than other GHH shareholders, including Plaintiffs.

100.     As a direct and proximate result of Clifford's breaches, Plaintiffs and other GHH shareholders were damaged because, among other things, they received less consideration from the Merger than they were led to believe when they voted on the transaction.

101.     Accordingly, Plaintiffs and other GHH shareholders have been damaged by Clifford's conduct. Clifford advised shareholders to move forward with the transaction despite his direct knowledge that Plaintiffs and GHH shareholders did not have full disclosure of the facts regarding same, and despite that Clifford knew he was withholding material information from Plaintiffs and GHH regarding the Merger.

**COUNT IV**
**– Breach of Fiduciary Duty –**
**(Against Brescia)**

102.     Plaintiffs re-assert and re-allege the allegations of Paragraphs 1 through 82 above and specifically incorporates said allegations herein.

103.     Brescia took over as the manager of GHH on January 1, 2018.

104.     As of that date, GHH resolved to permit Brescia, in place of Clifford and in his capacity as manager, to take actions in furtherance of closing the Merger, despite the insufficient disclosures and breaches of the duties identified above.

105.     On January 16, 2018, while Brescia was Manager, the Merger was consummated.

106.     Brescia, as the Manager and as a director of GHH, owed Plaintiffs various fiduciary duties, including the duties of care, loyalty, good faith, and full disclosure.

107.     Brescia's conduct since January 1, 2018, including but not limited to, secretly closing the transaction with iAnthus despite the insufficient disclosures described above –

21

resulting in Plaintiffs receiving roughly 20% less consideration as a result of the Merger than they should have received – constitutes a breach of Brescia's fiduciary duties.

108.     As a direct and proximate result of Brescia's breaches, Plaintiffs and other GHH shareholders were damaged because, among other things, they received less consideration from the Merger than they were led to believe when they voted on the transaction.

109.     Accordingly, Plaintiffs and other GHH shareholders have been damaged by Brescia's conduct. Brescia closed the transaction despite his direct knowledge that Plaintiffs and GHH shareholders did not have full disclosure of the facts regarding same, and that iAnthus was not sufficiently financially sound to invest in and run GHH post-Merger as promised.

**COUNT V**
**– Breach Implied Covenant of Good Faith and Fair Dealing –**
**(Against Clifford)**

110.     Plaintiffs re-assert and re-allege the allegations of Paragraphs 1 through 82 above and specifically incorporates said allegations herein.

111.     Clifford acted unreasonably and/or arbitrarily in his actions described herein, thereby frustrating the fruits of the bargain that Plaintiffs reasonably expected to receive as a result of the Merger.

112.     The implied covenant of good faith and fair dealing barred Clifford from acting in the manner he did, including, *inter alia*, from making false and/or misleading statements and representations about the Merger Consideration that Plaintiffs expected to receive as a result of the Merger.

113.     Clifford's conduct resulted in Plaintiffs receiving roughly 20% less consideration as a result of the Merger than they should have received.

51512998;1

114.    As a direct and proximate result of Clifford's conduct, Plaintiffs and other GHH shareholders were damaged because, among other things, they received less consideration from the Merger than they were led to believe when they voted on the transaction.

## COUNT VI
### – Breach Implied Covenant of Good Faith and Fair Dealing –
### (Against Brescia)

115.    Plaintiffs re-assert and re-allege the allegations of Paragraphs 1 through 82 above and specifically incorporates said allegations herein.

116.    Brescia acted unreasonably and/or arbitrarily in his actions described herein, thereby frustrating the fruits of the bargain that Plaintiffs reasonably expected to receive as a result of the Merger.

117.    The implied covenant of good faith and fair dealing barred Brescia from acting in the manner he did, including, *inter alia*, from making false and/or misleading statements and representations about the Merger Consideration that Plaintiffs expected to receive as a result of the Merger.

118.    Brescia's conduct resulted in Plaintiffs receiving roughly 20% less consideration as a result of the Merger than they should have received.

119.    As a direct and proximate result of Brescia's conduct, Plaintiffs and other GHH shareholders were damaged because, among other things, they received less consideration from the Merger than they were led to believe when they voted on the transaction.

## COUNT VII
### – FRAUD –
### (Against Balboni)

120.    Plaintiffs re-assert and re-allege the allegations of Paragraphs 1 through 82 above and specifically incorporate said allegations herein.

121.     Balboni repeatedly represented to the Plaintiffs, that the proposed and contemplated transactions with iAnthus were in the best interests of Plaintiffs and GHH shareholders.

122.     Furthermore, at all times material hereto, between August 2017 and the closing of the Merger, Balboni represented to Plaintiffs that the Merger would result in a conversion ratio of $1.02/share of GHH stock.

123.     Balboni knowingly drafted false statements of material fact in the Shareholder Package, and stayed silent about those misrepresentations at the October 10, 2017 annual meeting.  In fact, Balboni presented during the meeting of shareholders that took place on October 10, 2017, and misrepresented that the Merger would result in a conversion ratio of $1.02/share of GHH stock.

124.     Balboni authored and authorized the distribution of the inadequate and legally deficient Shareholder Package, which disseminated to Plaintiffs and GHH shareholders false, misleading, deceptive and incomplete information regarding the Merger with iAnthus, including specifically, the consideration amount and structure.

125.     Balboni knew the representations to be false, and knew that Plaintiffs would rely on the representations.

126.     Plaintiffs relied on these representations by Balboni to their detriment, and have been damaged as a result – as Plaintiffs' Merger consideration was diluted by 20% of its value.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that this Honorable Court enter a Final Judgment in favor of Plaintiffs and against Defendants:

A)      Awarding Plaintiffs damages in an amount to be determined at trial;

B)    Taking jurisdiction of this action to permit Plaintiffs to amend their Complaint to plead punitive damages at the appropriate time and in accordance with the Florida Rules of Civil Procedure and the relevant Florida Statutes, against all Defendants;

C)    Awarding Plaintiffs its attorneys' fees and costs, as applicable; and

D)    Granting Plaintiffs such further and additional relief as this Court deems just and proper.

## JURY TRIAL DEMAN

Plaintiffs demand trial by jury of all issues so triable as a matter of right.

Dated:  January 14, 2020.                     Respectfully submitted,

                                              /s/ David P. Vitale Jr.
                                              Jack Scarola, Esq. (Florida Bar No. 169440)
                                              David P. Vitale Jr., Esq. (Florida Bar No. 115179)
                                              **Searcy Denney Scarola Barnhart & Shipley, PA**
                                              2139 Palm Beach Lakes Blvd.
                                              West Palm Beach, FL 33406
                                              Phone:  (561) 686-6300
                                              Fax:  (561) 383-9451
                                              Primary Email:  jsx@searcylaw.com
                                              Secondary Email:  _scarolateam@searcylaw.com
                                              Primary Email:  dvitale@searcylaw.com
                                              Secondary Email: vitaleteam@searcylaw.com

NOT A CERTIFIED COPY

51512998;1

EXHIBIT 'A'

Grow Healthy

515 North Flagler Drive
Suite 1700
West Palm Beach, FL 33401

_____

**Notice of Special Meeting of Shareholders**
**and**
**Memorandum to Shareholders**

_____

**CONFIDENTIAL**

September 29, 2017

NOT A CERTIFIED COPY



September 29, 2017

RE:    NOTICE OF SPECIAL MEETING OF SHAREHOLDERS

Dear Shareholder:

We are pleased to invite you to a Special Meeting of the shareholders of GrowHealthy Holdings, LLC, a Delaware limited liability company (**"GrowHealthy"**), which will be held on October 10, 2017 at 3 p.m. EST at Hilton West Palm Beach, 600 Okeechobee Boulevard, West Palm Beach, Florida 33401, and thereafter as it may be adjourned from time to time, for the following purposes:

To consider and approve:

1.    A transaction with iAnthus Capital Management, LLC, a wholly owned subsidiary of iAnthus Capital Holdings, Inc., involving:

- A merger of a subsidiary of GrowHealthy which holds all of the personal property and intellectual property assets of GrowHealthy, GrowHealthy Properties, LLC (**"GrowHealthy Properties"**), and GrowHealthy Farms Florida, LLC (**"GrowHealthy Farms"**) (except the Medical Marijuana Treatment Center license (the **"License"**) of McCrory's Sunny Hill Nursery, LLC (**"McCrory's"**)) and GrowHealthy Farms's membership interest in McCrory's) and all of the cannabis assets of McCrory's (other than live and dry plant inventory and seeds, and other assets which require a license to legally possess);

- a merger of a subsidiary of GrowHealthy which holds a management contract with McCrory's; and

- the sale of the real property owned by GrowHealthy Properties (collectively, the **"iAnthus Transaction"**);

2.    The redemption of a portion of the Shares (as defined below) held by shareholders that have a right under Section 7.14 of GrowHealthy's Limited Liability Company Agreement (as amended, the **"LLC Agreement"**) to designate a member of the Board of Directors (the **"Directed Redemption"**); and

3.    To transact such other business as may properly come before the meeting or any adjournment thereof.

In order for shareholders to evaluate the matters to be voted upon at the Special Meeting, detailed information about the proposed transactions is provided in the accompanying Memorandum.

Holders of record of shares of limited liability company interest of GrowHealthy (**"Shares"**) at the close of business on September 27, 2017, are entitled to notice of and to vote at the Special Meeting or any adjournment Special Meeting.

The Board of Directors recommends a vote "FOR" the matters being voted upon.

**Attendance at the Special Meeting is limited to shareholders, their proxies, and the invited guests of GrowHealthy.**

**YOUR VOTE IS IMPORTANT!**

KH457064.DOCX 2

WHETHER OR NOT YOU PLAN TO ATTEND THE MEETING, PLEASE EXECUTE THE ATTACHED PROXY AND RETURN IT BY MAIL TO 1201 WEST PEACHTREE STREET, SUITE 3250, ATLANTA, GA 30309 OR BY FAX TO (404) 812-3101, OR BY EMAIL TO HO@KHLAWFIRM.COM.  THIS WILL ENSURE THE PRESENCE OF A QUORUM AT THE MEETING.  IF YOU ATTEND THE MEETING, YOU MAY VOTE IN PERSON IF YOU WISH TO DO SO, EVEN IF YOU HAVE PREVIOUSLY EXECUTED THE PROXY.

BY ORDER OF THE BOARD OF DIRECTORS,

Don Clifford

Don Clifford, Chief Executive Officer and Manager

NOT A CERTIFIED COPY

KH457064.DOCX 2



## MEMORANDUM TO SHAREHOLDERS

This Memorandum to Shareholders (this "**Memorandum**") is furnished to all shareholders of GrowHealthy Holdings, LLC (the "**GrowHealthy**") of record on September 27, 2017 (the "**Shareholders**") in connection with GrowHealthy's request that all holders of GrowHealthy's shares of limited liability company interest approve: (1) the sale of the real property owned by GrowHealthy Properties, LLC for up to $12.5 million in cash; (2) the merger of two subsidiaries of GrowHealthy for at least $30.5 million of iAnthus Capital Holdings, Inc. common stock; and (3) the redemption of shares in the aggregate amount of $9 million from GrowHealthy's shareholders that have a right to designate a member of the Board of Directors (collectively, the "**Proposed Transactions**").

**THE BOARD OF DIRECTORS OF GROWHEALTHY HAS APPROVED THE TERMS OF THE PROPOSED TRANSACTIONS AND RECOMMENDS THAT GROWHEALTHY'S SHAREHOLDERS VOTE IN FAVOR OF THE PROPOSED TRANSACTIONS AT THE SPECIAL MEETING OF THE SHAREHOLDERS ON OCTOBER 10, 2017.**

---

THE INFORMATION CONTAINED IN THIS MEMORANDUM IS CONFIDENTIAL AND PROPRIETARY TO GROWHEALTHY, AND IS BEING SUBMITTED TO GROWHEALTHY'S SHAREHOLDERS SOLELY FOR THEIR CONFIDENTIAL USE, WITH THE EXPRESS UNDERSTANDING THAT WITHOUT THE PRIOR PERMISSION IN WRITING FROM GROWHEALTHY, SUCH SHAREHOLDERS WILL NOT RELEASE THIS MEMORANDUM TO, OR DISCUSS THE INFORMATION CONTAINED HEREIN WITH, ANY PERSON OTHER THAN PERSONS AUTHORIZED BY GROWHEALTHY OR THE ADVISORS TO SUCH SHAREHOLDERS, NOR WILL SUCH SHAREHOLDERS MAKE REPRODUCTIONS OR USE THIS MEMORANDUM FOR ANY OTHER PURPOSE OTHER THAN EVALUATING THEIR DECISIONS WITH RESPECT TO THE PROPOSED TRANSACTIONS.

THE INFORMATION IN THIS MEMORANDUM SUPERSEDES ALL OTHER INFORMATION OR REPRESENTATIONS, IF ANY, THAT MAY HAVE BEEN PREVIOUSLY GIVEN OR MADE IN CONNECTION WITH THE PROPOSED TRANSACTIONS. GROWHEALTHY'S SHAREHOLDERS SHOULD RELY ONLY ON THE INFORMATION CONTAINED HEREIN, AND SHALL NOT BE ENTITLED TO RELY ON ANY OTHER INFORMATION, STATEMENTS OR REPRESENTATIONS, IF ANY, MADE AT ANY PREVIOUS DATE WITH RESPECT TO THE SUBJECT MATTER HEREOF.

---

This Memorandum is dated September 29, 2017.  Copies of this Memorandum will first be distributed to Shareholders on September 30, 2017.

## TABLE OF CONTENTS

GENERAL INFORMATION ............................................................................................1

INFORMATION ABOUT IANTHUS ..........................................................................3

SUMMARY OF TERMS OF THE PROPOSED TRANSACTIONS ...........................5
    GHH Merger Company ..............................................................................................5
    GHH Management Company and the Management Agreement ..................................5
    The Real Estate .........................................................................................................5
    The Mergers ..............................................................................................................6
    iAnthus Common Stock .............................................................................................6
    Purchase of Performance Bond .................................................................................6
    Directed Redemptions ...............................................................................................7
    General Tender Offer .................................................................................................7
    Distribution of Stock Consideration ..........................................................................7
    The Lock-Up .............................................................................................................7
    Indemnification .........................................................................................................8
    Shareholder Representative Agreement .....................................................................8

MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES .............................9
    General Information. ..................................................................................................9
    U.S. Federal Income Tax Consequences of the Proposed Transactions....................10
    The Mergers ............................................................................................................10
    The Real Estate Sale ...............................................................................................10
    The Tender or Other Sale to GrowHealthy of GrowHealthy Shares ........................10
    Information Reporting and Backup Withholding.......................................................11

SUMMARY OF TERMS OF THE McCRORY'S TRANSACTIONS ........................11
    Condition to Merger ................................................................................................11
    Ward and Dolores McCrory .....................................................................................11
    Eve's Garden, Inc., AgriStarts, Inc., and Peckett's, Inc. .........................................12
    Interim Funding .......................................................................................................12

GROWHEALTHY'S MANAGEMENT .....................................................................12
    Directors and Executive Officers .............................................................................12
    Principal Shareholders .............................................................................................13
    Redemption and Voting Agreements ........................................................................14
    Approval of Directed Redemption ...........................................................................14
    Other Uses of the Cash Proceeds.............................................................................15

ADDITIONAL INFORMATION ................................................................................15

*Attachment 1*:  Proxy

*Attachment 2*:  Reorganization Diagram

## GENERAL INFORMATION

*Why am I receiving this Memorandum?*

GrowHealthy and iAnthus Capital Management, LLC (**"iAnthus"**) have negotiated the terms of the following transactions (the **"iAnthus Transactions"**):

- a Real Estate Purchase Agreement (the **"Real Estate Purchase Agreement"**) that contemplates the sale of GrowHealthy's cultivation and manufacturing facility in Lake Wales, Florida to iAnthus for up to $12.5 million in cash (the **"Real Estate Proceeds"**);

- an Agreement and Plan of Merger (the **"First Merger Agreement"**) that contemplates a merger pursuant to which a subsidiary of GrowHealthy (**"GHH Merger Company"**) that holds all of the assets of GrowHealthy, GrowHealthy Farms Florida, LLC (**"GrowHealthy Farms"**), and GrowHealthy Properties, LLC (**"GrowHealthy Properties"**), including equipment, intellectual property and all other tangible and intangible assets utilized in the cannabis business of McCrory's Sunny Hill Nursery, LLC (**"McCrory's"**) (and excluding (i) the cultivation and manufacturing facility in Lake Wales, Florida; (ii) GrowHealthy's ownership interest in GrowHealthy Farms; (iii) GrowHealthy's ownership interest in GrowHealthy Properties; (iv) GrowHealthy Farms' ownership interest in McCrory's; (v) assets of McCrory's that are unrelated to the cannabis business of McCrory's; and (vi) any asset such as the inventory and the growing supplies of McCrory's, which are illegal for any person that is not the holder of a Medical Marijuana Treatment Center license to possess under the laws of the State of Florida), will merge with and into a limited liability company to be formed by and wholly-owned by iAnthus (**"iAnthus Merger Company"**), with iAnthus Merger Company as the surviving entity (the **"First Merger"**), and

- an Agreement and Plan of Merger (the **"Second Merger Agreement"**) that contemplates a merger pursuant to which a subsidiary of GrowHealthy (**"GHH Management Company"**) that holds a management contract with McCrory's, would merge with and into iAnthus Merger Company, with GHH Management Company as the surviving entity (the **"Second Merger"**, and together with the First Merger, the **"Mergers"**).

At the closing of the iAnthus Transactions, in connection with the Mergers, GrowHealthy will receive at least $30.5 million of iAnthus Capital Holdings, Inc. common stock (the **"Stock Consideration"**). GrowHealthy will also receive $5 million from iAnthus for the assignment of the performance bond posted on behalf of McCrory's in connection with the License (the **"Bond Proceeds"**, and together with the Real Estate Proceeds, the **"Cash Proceeds"**).

*Are there any other transactions to be consummated in connection with the Mergers?*

GrowHealthy intends to use up to $9 million of the Cash Proceeds to fund the redemption of shares of limited liability company interest of GrowHealthy (the **"Shares"**) from shareholders that have a right to designate a member of GrowHealthy's Board of Directors under the LLC Agreement pursuant to Redemption and Voting Agreements which obligate these shareholders to vote (a) for an amendment of GrowHealthy's Limited Liability Company Agreement (the **"LLC Agreement"**) that eliminates Section 7.14 of the LLC Agreement, which thereby terminates such shareholders' right to designate a member of the Board of Directors, and (b) to approve the iAnthus Transactions (the **"Directed Redemption"**, and together with the iAnthus Transactions, the **"Proposed Transactions"**).

In addition, through a tender offer, GrowHealthy intends to use up to $6 million of the Cash Proceeds to redeem up to 5,850,005 Shares from the shareholders who do not have a right to designate a member of the Board of Directors.

### *What are the details of the Proposed Transactions?*

Detailed information concerning the Proposed Transactions is provided beginning on page 5 under the heading "Summary of Terms of the Proposed Transactions."

### *How many Shares are outstanding?*

As of the date of this Memorandum, there are 47,588,708 shares of limited liability company interest issued and outstanding.

### *What percentage of outstanding Shares is required to approve the Proposed Transactions?*

Pursuant to Section 7.9 of the LLC Agreement, as amended, GrowHealthy must obtain the affirmative vote of shareholders holding at least 75% of all Shares present at any meeting at which a quorum is present, in person or by proxy, or the written consent of shareholders holding at least 75% of all then outstanding Shares to approve (a) the sale, exchange, or other disposition of all, or substantially all, of GrowHealthy's assets which is to occur as part of a single transaction or plan, and (b) any merger of GrowHealthy. Accordingly, shareholder approval is required to consummate the Proposed Transactions.

A majority of the Board of Directors has adopted a resolution approving the terms of the Proposed Transactions.

The Board of Directors recommends that the shareholders vote to approve the Proposed Transactions at the Special Meeting on October 10, 2017.

### *How do I approve the Proposed Transactions?*

Complete, sign, and deliver a proxy in the form of *Attachment 1* hereto (the **"Proxy"**), or attend the Special Meeting in person and vote.

Whether or not you plan to attend the meeting, please execute the Proxy in the form of *Attachment 1* hereto and return it by mail to 1201 West Peachtree Street, Suite 3250, Atlanta, GA 30309, or by fax to (404) 812-3101, or by email to ho@khlawfirm.com. This will ensure the presence of a quorum at the meeting. If you attend the meeting, you may vote in person if you wish to do so, even if you have previously executed the Proxy.

### *What do I do if I oppose the Proposed Transactions?*

You do not vote to approve the Proposed Transactions at the Special Meeting on October 10, 2017, and do not sign the Proxy.

### *What is the estimated closing date of the Proposed Transactions?*

The estimated closing date of the Proposed Transactions is on or about December 31, 2017.

## INFORMATION ABOUT IANTHUS

iAnthus Capital Holdings, Inc., through its wholly-owned subsidiary iAnthus Capital Management, LLC (**"ICM"** and, together with iAnthus Capital Holdings, Inc., **"iAnthus"**), provides its shareholders with diversified investment exposure to best-in-class licensed regulated cannabis industry cultivation, processing and dispensary operations throughout the United States. Founded by entrepreneurs with decades of experience in investment banking, corporate finance, regulatory law, and healthcare services, iAnthus provides a unique combination of capital and hands-on operating and management expertise. iAnthus harnesses these skills to acquire and operate a diversified portfolio of regulated cannabis industry investments for its shareholders. iAnthus's headquarters are located in New York City, with a satellite office in Toronto.

ICM, a Delaware limited liability company, was founded in New York City in 2014 as a provider of capital investment and management services in the rapidly-expanding U.S. regulated cannabis industry. In 2016, in order to capitalize on the development of a sophisticated public capital market in Canada that facilitates capital formation for regulated cannabis industry businesses, ICM was merged with the Canadian corporation Genarca Holdings Ltd., which changed its name to its present name, iAnthus Capital Holdings, Inc., on August 4, 2016. iAnthus Capital Holdings, Inc. was subsequently listed on the Canadian Securities Exchange and began trading on September 7, 2016 under the ticker symbol "IAN". iAnthus Capital Holdings, Inc. is also listed for trading on the OTCQB, part of the OTC Markets Group, under the ticker symbol "ITHUF".

Twenty-nine U.S. states and the District of Columbia have now legalized the cultivation and sale of full-strength cannabis for medical purposes. In addition, eight states and the District of Columbia have completely legalized cannabis for both medical and recreational use by adults over the age of 21. Total legal cannabis sales in the U.S. were an estimated $6.6 billion in 2016 and the industry's annual growth rate is expected to accelerate to over 40% in 2018 and 2019 reaching an estimated $22.8 billion in sales in 2020, according to The Cannabis Industry Annual Report: 2017 Legal Marijuana Outlook, published by New Frontier Data, a U.S. based data analytics firm focused on regulated cannabis industries.

Despite the burgeoning state-legal cannabis industry in the U.S., cannabis remains a Schedule I substance under the Federal Controlled Substances Act of 1970. As a result, the regulated cannabis industry does not typically have access to institutional sources of capital investment such as private equity and venture capital funds or commercial banks. This capital scarcity is expected to continue until repeal of the federal prohibition on cannabis cultivation and sale. The high demand for legal cannabis and limited number of licenses under most state regulatory schemes, combined with the artificially restricted availability of capital, has created an environment for compelling investment opportunities.

iAnthus' portfolio currently includes five investments in four states: Massachusetts, New Mexico, Vermont, and Colorado. In addition, on August 14, 2017, iAnthus announced a letter of intent to acquire one of the ten vertically-integrated medical cannabis license holders in New York State. Closing this transaction would expand iAnthus' operations into five states, including two of the most-heavily populated medical cannabis states in the Eastern U.S.

iAnthus' capital investment portfolio and operations are led by a management team that has significant experience in investment banking and finance, healthcare services, real estate and construction, business operations, and regulatory compliance. The management team is, in turn, backed by an advisory board that is comprised of members with expertise in every aspect of the cannabis industry, from medicine and science to cultivation, operations and advocacy.

KH457064.DOCX 2                                    3

The following table sets forth more information regarding iAnthus' directors and executive officers:

| Name, Province or State and Country of Residence | Positions | Previous Experience |
|---|---|---|
| Randy Maslow Delray Beach, Florida | Co-founder, President and Director | • Senior Vice President and General Counsel, IGE U.S., 2003-2006<br>• Managing Partner, Electric Ventures, 1997-2003<br>• Senior Vice President and General Counsel, XO Communications, Inc., 1991-1997<br>• Former attorney at Greenberg Traurig |
| Hadley Ford New York, New York | Co-founder, CEO and Director | • Co-founder and CEO of Procure Treatment Centers, Inc. 2005-2013<br>• Former Investment Banker at Goldman Sachs, Bank of America and First Boston |
| Julius Kalcevich Toronto, Ontario | CFO and Director | • Partner at Bellotti Goodman 2013-2016<br>• Director at CIBC World Markets 2011-2013<br>• Vice President at Dundee Capital Markets, April 2010 - July 2011 |
| Carlos Perea Albuquerque, New Mexico | Chief Operating Officer | • President, Nuvita Corp, 2013-2016<br>• CEO, Miox Corp., 2005-2012<br>• Managing Director, Entrada Venture Partners, 2005-2005<br>• Director of Manufacturing, Intel, Inc., 1992-2001 |
| John Henderson Boston, Massachusetts | Chief Development Officer | • COO, Proton International LLC, 2013-2014<br>• COO and CDO, ProCure Treatment Centers, 2005-2013 |
| Dr. Richard J. Boxer Los Angeles, California | Director | • 2016 Attending Urologist, Los Angeles Wadsworth Veteran's Administration Hospital, 2013 through present<br>• UCLA Visiting Professor of Urology and Visiting Scholar, UCLA Business of Science Center, 2013 through present<br>• Professor of Clinical Urology, University of Miami, Miami, FL, 2007-2012<br>• Healthcare policy adviser to President Clinton and two-time finalist for Surgeon General of the United States |
| Paul Rosen Toronto, Ontario | Director | • President & CEO of PharmaCan Capital from March 2013 - May 2016<br>• Chairman of Skypad Inc. from 1996 through present |

Additional information regarding iAnthus Capital Holdings, Inc. may be found in its Annual Information Form, dated September 20, 2017 (available here)[1], in this report from Cormark Securities Inc. (available here)[2], and on the iAnthus website (available here)[3], the Canadian Securities Exchange website (available here)[4], and the NASDAQ website (available here).[5]

---

[1] http://thecse.com/sites/default/files/investorx/IAN/1709201609099886.pdf

[2] https://khlawfirm.sharefile.com/share?#/view/sd35fe8019a74694a

[3] http://ir.ianthuscapital.com/

[4] http://thecse.com/en/listings/life-sciences/ianthus-capital-holdings-inc

[5] http://www.nasdaq.com/symbol/ithuf/stock-chart

## SUMMARY OF TERMS OF THE PROPOSED TRANSACTIONS

THE FOLLOWING SUMMARY OF TERMS IS QUALIFIED IN ITS ENTIRETY BY THE CURRENT DRAFTS OF THE REAL ESTATE PURCHASE AGREEMENT AND THE FIRST MERGER AGREEMENT COPIES OF WHICH ARE AVAILABLE HERE[6] AND HERE,[7] RESPECTIVELY.  THESE DRAFTS ARE SUBJECT TO REVISION.

### *GHH Merger Company*

GrowHealthy Farms Florida, LLC, a Florida limited liability company that is a wholly-owned subsidiary of GrowHealthy (**"GrowHealthy Farms"**), owns 75% of the issued and outstanding limited liability company interests of McCrory's Sunny Hill Nursery, LLC, a Florida limited liability company (**"McCrory's"**).  McCrory's was granted a license by the Florida Department of Health as a Medical Marijuana Treatment Center (the **"License"**), and McCrory's is thereby licensed to cultivate, manufacture and dispense approved medical cannabis products in Florida.

To facilitate the Proposed Transactions, GrowHealthy, GrowHealthy Farms, and GrowHealthy Properties, LLC (**"GrowHealthy Properties"**) shall contribute to a Florida corporation to be formed by and wholly-owned by GrowHealthy (**"GHH Merger Company"**), 100% of their respective tangible and intangible assets excluding (i) the Real Estate (as defined below); (ii) GrowHealthy's ownership interest in GrowHealthy Farms; (iii) GrowHealthy's ownership interest in GrowHealthy Properties; (iv) GrowHealthy Farms' ownership interest in McCrory's; (iv) assets of McCrory's that are unrelated to McCrory's cannabis business; and (v) any asset such as the inventory and the growing supplies of McCrory's, which are illegal for any person that is not the holder of a License under the laws of the State of Florida (collectively, the **"Contributed Assets"**).

### *GHH Management Company and the Management Agreement*

Prior to the closing of the Proposed Transactions, GrowHealthy and GrowHealthy Farms will cause McCrory's to enter into a management contract (the **"Management Agreement"**) with a Florida corporation to be formed by and wholly-owned by GrowHealthy (**"GHH Management Company"**).

The Management Agreement will (1) provide GHH Management Company with the power and authority to manage and operate the cannabis business on behalf of McCrory's for a term of 40 years (with automatic five year renewal terms) in exchange for 100% of the pre-tax profits, economic benefit and economic risk of the cannabis business; and (2) grant GHH Management Company an option to acquire and purchase the License and/or all of the issued and outstanding ownership interests and/or shares of limited liability company interests of McCrory's (the **"McCrory's Option"**) at any time during the term of the Management Agreement; provided that the exercise of the McCrory's Option shall be subject to any consent or approval required by applicable law from the Florida Department of Health.

### *The Real Estate*

GrowHealthy Properties owns certain real property consisting of approximately 33 acres, and an industrial facility comprising approximately 200,000 square feet, located in Lake Wales, Florida, which serves as a cultivation and manufacturing facility for McCrory's (the **"Real Estate"**).

---

[6] https://khlawfirm.sharefile.com/share?#/view/s7ca5be3099f4b31a
[7] https://khlawfirm.sharefile.com/share?#/view/s93630ae493e4884a

Prior to the closing of the Proposed Transactions, GrowHealthy, GrowHealthy Properties, and a Florida limited liability company to be formed by and wholly-owned by iAnthus (**"iAnthus Real Estate Company"**), will enter into a purchase agreement (the **"Real Estate Purchase Agreement"**), pursuant to which iAnthus Real Estate Company will purchase the Real Estate for up to $12.5 million in cash (the **"Real Estate Proceeds"**) at the closing of the Proposed Transactions (the **"Real Estate Sale"**). The exact amount of the Real Estate Proceeds will be agreed upon by GrowHealthy and iAnthus prior to the closing of the Proposed Transactions, provided any reduction in the Real Estate Proceeds shall increase, dollar for dollar, the Purchase Price (as defined below).

### The Mergers

The First Merger Agreement provides for a merger pursuant to which GHH Merger Company will merge with and into a limited liability company to be formed by and wholly-owned by iAnthus (**"iAnthus Merger Company"**), with iAnthus Merger Company as the surviving entity (the **"First Merger"**).

The Second Merger Agreement provides for a merger pursuant to which GHH Management Company will merge with and into iAnthus Merger Company, with GHH Management Company as the surviving entity (the **"Second Merger"**, and together with the First Merger, the **"Mergers"**).

At the closing of the Proposed Transactions, pursuant to the Mergers, GrowHealthy shall receive at least $30.5 million (the **"Purchase Price"**) payable in shares of common stock of iAnthus Capital Holdings, Inc. (the **"iAnthus Stock"**). The number of shares of iAnthus Stock that will be received (the **"Stock Consideration"**) will be determined by dividing the Purchase Price by a 20-day VWAP (volume weighted average trading price), which shall be determined on the date of the public announcement of the Proposed Transactions, shortly after the Special Meeting on October 10, 2017, and shall not be greater than US$2.519 per share nor less than US$2.061 per share.

The estimated closing date of the Proposed Transactions will be on or about December 31, 2017.

### iAnthus Common Stock

iAnthus Stock is listed on the Canadian Securities Exchange under the ticker symbol "IAN" and is trading on the OTCQB under ticker symbol "ITHUF".

The Stock Consideration consists of unregistered shares which are subject to restrictions on transfer. Under Canadian law, the restrictions on resale terminate 4 months following the closing of the Proposed Transactions. Under Rule 144 under the U.S. Securities Act, the restrictions on resale terminate 6 months following the closing of the Proposed Transactions.

### Purchase of Performance Bond

At the closing of the Proposed Transactions, iAnthus will assume the performance bond GrowHealthy posted with the Florida Department of Health on behalf of McCrory's (the **"Bond"**) for $5 million (the **"Bond Proceeds"**). The Bond Proceeds will be reduced dollar for dollar by the amount of debt of GrowHealthy, other than intercompany debt, the interim financing provided by iAnthus, and trade accounts payable incurred in the ordinary course of business.

*Directed Redemptions*

GrowHealthy has entered into Redemption and Voting Agreements (as amended) with shareholders of GrowHealthy (the **"Director Shareholders"**) that have a right to designate a member of the Board of Directors pursuant to Section 7.14 of that certain Limited Liability Company Agreement of GrowHealthy dated as of May 13, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the **"LLC Agreement"**) to redeem the shares of limited liability company interest (the **"Shares"**) from such shareholders at a price of $1.02564 per Share, in exchange for (a) an agreement to vote for an amendment of the LLC Agreement that would eliminate such shareholders' right to designate a member of the Board of Directors, and (b) an agreement to vote to approve the Proposed Transactions (the **"Directed Redemptions"**).  GrowHealthy intends to use up to $9 million of the Cash Proceeds to fund the Directed Redemptions.  On or before October 15, 2017, GrowHealthy and iAnthus will enter into a share purchase agreement pursuant to which iAnthus will purchase up to 2,925,003 Class B Preferred Shares of GrowHealthy at a price per share of $1.02564 to satisfy certain of the obligations under the Redemption and Voting Agreements (as amended).

*General Tender Offer*

GrowHealthy will make an offer to redeem up to 5,850,005 Shares from shareholders of GrowHealthy (the **"Eligible Shareholders"**) who do not have a right to designate a member of the Board of Directors pursuant to Section 7.14 of the LLC Agreement at a price of $1.02564 per Share, pursuant to a Solicitation of Offers to Sell Shares to GrowHealthy Holdings, LLC and a Redemption Agreement with each such shareholder (the **"Tender Offer"**), which will be circulated to such shareholders after the Special Meeting on October 10, 2017.  Each Eligible Shareholder who desires to sell their Shares under the terms of the Tender Offer will enter into a Redemption Agreement with GrowHealthy, pursuant to which such shareholder will indicate, on the Signature Page to the Redemption Agreement, the number of Shares the shareholder is willing to sell to GrowHealthy (the **"Offered Shares"**).  GrowHealthy will then indicate on the same Signature Page the number of Offered Shares GrowHealthy agrees to purchase from the shareholder.

GrowHealthy intends to use up to $6 million of the Cash Proceeds to fund the Tender Offer.  In the event that less than 5,850,005 Shares are tendered by the shareholders, the unused portion of the $6 million will increase the Stock Consideration.

*Distribution of Stock Consideration*

At the closing of the Proposed Transactions, after giving effect to the reduction in the number of outstanding Shares that result from the Directed Redemptions and the Tender Offer, GrowHealthy will distribute the Stock Consideration to its shareholders in accordance with the number of Shares that each shareholder then holds.

*The Lock-Up*

The First Merger Agreement and Second Merger Agreement (collectively, the **"Merger Agreements"**) contemplate that certain executives of GrowHealthy will enter into and be subject to a lock-up agreement providing an escrow over 3 years, with 10% of their Stock Consideration released immediately, and an additional 15% of Stock Consideration released every 6 months thereafter.

*Indemnification*

The Merger Agreements require the shareholders of GrowHealthy jointly and severally, on a pro rata basis, to indemnify iAnthus and its affiliates for Adverse Consequences (as such term is defined in the Merger Agreements) incurred by iAnthus and its affiliates as a result of the (a) inaccuracies of any representation, warranty, covenant, and obligation contained in Articles VII (except for Section 7.2 (Ownership of GHH)) and VIII of the Merger Agreements, (b) any Taxes imposed on GHH Merger Company, GHH Management Company, GrowHealthy Farms, or McCrory's for any tax period prior to the closing of the Proposed Transactions, (c) the failure of any Benefit Plan (as defined in the Merger Agreements) of GHH Merger Company, GHH Management Company, GrowHealthy Farms, or McCrory's to satisfy the nondiscrimination requirements of Section 105(h)(2) of the Internal Revenue Code of 1986, and (d) any claims incurred on or prior to the closing of the Proposed Transactions by employees or former employees of GHH Merger Company, GHH Management Company, GrowHealthy Farms, or McCrory's or their covered dependents under any of their medical and prescription plans.

In addition, each of the shareholders will severally, and not jointly, indemnify iAnthus and its affiliates for Adverse Consequences incurred as a result of the breach of any representation or warranty contained in Section 7.2 (Ownership of GHH) of the Merger Agreements with respect to such shareholder or of the covenants made by such shareholder in the Merger Agreements.

As protection for the shareholders of GrowHealthy, iAnthus may only bring an indemnification claim with respect to Adverse Consequences resulting from inaccuracies of any representation, warranty, covenant and/or obligation contained in Articles VII (except for Section 7.2) and VIII of the Merger Agreements (other than (a) any of the representations and warranties contained in Sections 8.1 (Authority of the Companies), 8.2(a) (Capitalization; Ownership), 8.3 (Organization; Subsidiaries), and 8.13 (Brokers and Finders) of the Merger Agreements (the **"Fundamental Representations"**), (b) any representations and warranties contained in Sections 8.9 (Tax Matters) and 8.11 (Employee Benefits and Related Matters) of the Merger Agreements, or (c) fraud) once iAnthus has collectively suffered Adverse Consequences in excess of $50,000 in the aggregate (the **"Basket"**). Once the Basket has been reached, iAnthus may recover for the full amount of the Adverse Consequences, including the Basket.

Further, the aggregate liability of any shareholder of GrowHealthy shall not exceed the sum of the value of such shareholder's pro rata portion of the Stock Consideration. A contribution agreement will be added to the LLC Agreement to provide that any shareholder who pays more than its pro rata portion of the Stock Consideration in satisfaction of an indemnification claim under the Merger Agreements may recover the overpayment from the other shareholders of GrowHealthy. However, the aggregate liability of the shareholders of GrowHealthy for Adverse Consequences resulting from fraud will not be subject to any limitation on amount.

iAnthus may only bring an indemnification claim against the shareholders of GrowHealthy for a period of 36 months following the closing of the Proposed Transactions.

*Shareholder Representative Agreement*

Prior to the closing of the Proposed Transactions, all holders of GrowHealthy Shares must execute and deliver a Shareholder Representative Agreement (the **"Shareholder Rep Agreement"**), which will be circulated to the shareholders at a later date.

Pursuant to the Shareholder Rep Agreement, Brian Brescia (the **"Representative"**), will serve as the agent and attorney-in-fact for each shareholder of GrowHealthy who has signed a signature page to the Shareholder Rep Agreement, to sign all documents in connection with the closing of the Proposed

Transactions on each shareholder's behalf, and to represent the shareholders at the closing of the Proposed Transactions and in connection with all post-closing matters.  The purpose of the Shareholder Rep Agreement is to facilitate the closing of the Proposed Transactions and simplify the administrative burdens of administering the Merger Agreements after the closing of the Proposed Transactions.

## MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES

*General Information.*

The following discussion summarizes the material U.S. federal income tax consequences of the Proposed Transactions to U.S. holders of GrowHealthy's Shares from the sale of the Real Estate, the sale of the performance bond, and the Mergers.  The discussion is based on and subject to the Internal Revenue Code of 1986, as in effect on the date hereof as amended (the **"Code"**), existing and proposed regulations promulgated thereunder (the **"Regulations"**), administrative rulings and court decisions in effect on the date hereof, all of which are subject to change, possibly with retroactive effect, and to differing interpretations.  The discussion assumes that GrowHealthy shareholders hold their Shares as a "capital asset" within the meaning of Section 1221 of the Code (generally, property held for investment).

The discussion does not constitute tax advice and does not address all aspects of U.S. federal income taxation that may be relevant to particular GrowHealthy shareholders in light of their personal circumstances, including any tax consequences arising under the Medicare contribution tax under Section 1411 of the Code, or to shareholders subject to special treatment under the Code, such as banks, thrifts, mutual funds and other financial institutions; regulated investment companies and real estate investment trusts; tax-exempt organizations and pension funds; insurance companies; individual retirement and other deferred accounts; persons liable for the alternative minimum tax; "S corporations", partnerships or other pass-through entities (and interests therein); and holders who received their Shares as compensation or through a tax-qualified retirement plan.

The discussion does not address any non-income U.S. tax considerations or any foreign, state or local tax consequences.  For purposes of this discussion, a U.S. holder means a beneficial owner of GrowHealthy's Shares who is: an individual who is a citizen or resident of the United States; a corporation (or other entity taxable as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the United States or any subdivision thereof; an estate the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source; or a trust if (1) a court within the United States is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust, or (2) the trust has a valid election in effect under applicable Regulations to be treated as a U.S. person for U.S. federal income tax purposes.

This discussion does not purport to be a comprehensive analysis or description of all potential U.S. federal income tax consequences to GrowHealthy's shareholders.  Each of GrowHealthy's shareholders should consult with such shareholder's tax advisor with respect to the particular tax consequences to such shareholder's receipt of their share of the Stock Consideration in the Proposed Transactions.

If a partnership, including for this purpose any entity or arrangement that is treated as a partnership for U.S. federal income tax purposes, holds GrowHealthy's Shares at the time of the Proposed Transactions, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partner and the partnership.  A holder that is a partnership and the partners in such partnership should consult their tax advisors about the U.S. federal income tax

consequences of such partnership's receipt of its share of the Stock Consideration in the Proposed Transactions.

**EACH OF OUR SHAREHOLDERS SHOULD CONSULT WITH THEIR TAX ADVISORS REGARDING THE TAX CONSEQUENCES OF THE PROPOSED TRANSACTIONS AND RECEIPT OF THE STOCK CONSIDERATION WHICH WILL BE PAID TO THEM IN CONNECTION WITH THE PROPOSED TRANSACTIONS, INCLUDING THE EFFECTS OF U.S. FEDERAL, STATE AND LOCAL, AND OTHER TAX LAWS AND ANY APPLICABLE INFORMATION REPORTING OBLIGATIONS.**

*U.S. Federal Income Tax Consequences of the Proposed Transactions*

*The Mergers*

GrowHealthy and iAnthus intend for the Mergers to qualify as a "reorganization" within the meaning of Section 368(a) of the Code. Accordingly, if the Mergers qualify as a "reorganization" within the meaning of Section 368(a) of the Code:

- a U.S. holder of GrowHealthy Shares will not recognize any gain or loss in connection with GrowHealthy's receipt of the Stock Consideration in the Mergers;

- a U.S. holder of GrowHealthy Shares will not recognize any gain or loss when the Stock Consideration is distributed to the GrowHealthy shareholders;

- a U.S. holder of GrowHealthy Shares will have a tax basis in the iAnthus Stock received in the Mergers equal to the tax basis of the GrowHealthy Shares after giving effect to any reduction in basis resulting from the Tender Offer or other purchase of Shares by GrowHealthy; and

- a U.S. holder of GrowHealthy Shares will have a holding period for shares of iAnthus common stock received in the Mergers that includes its holding period for GrowHealthy Shares.

*The Real Estate Sale*

The Real Estate Sale will be a taxable transaction for U.S. federal income tax purposes. A U.S. holder generally will recognize its allocable share of the gain or loss for U.S. federal income tax purposes equal to the difference, if any, between: (i) the Real Estate Proceeds; and (ii) GrowHealthy's adjusted basis in the Real Estate. Such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. holder's holding period for such shares, as determined for U.S. federal income tax purposes, exceeds one year as of the effective time of the Proposed Transactions. Long-term capital gains for noncorporate U.S. holders are generally eligible for a reduced rate of U.S. federal income taxation. The deductibility of capital losses is subject to limitations. If a U.S. holder acquired GrowHealthy Shares at different times or at different prices, such U.S. holder must determine its tax basis, holding period, and gain or loss separately with respect to each block of GrowHealthy Shares.

*The Tender or Other Sale to GrowHealthy of GrowHealthy Shares*

A sale of GrowHealthy Shares to GrowHealthy pursuant to the Tender Offer or Directed Redemption will be a taxable transaction for U.S. federal income tax purposes. A U.S. holder generally will recognize gain or loss for U.S. federal income tax purposes equal to the difference, if any, between:

(i) the proceeds received in the Tender Offer or Directed Redemption and (ii) a shareholder's adjusted basis in the Shares. Such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the U.S. holder's holding period for such shares, as determined for U.S. federal income tax purposes, exceeds one year as of the effective time of the Proposed Transactions. Long-term capital gains for noncorporate U.S. holders are generally eligible for a reduced rate of U.S. federal income taxation. The deductibility of capital losses is subject to limitations. If a U.S. holder acquired GrowHealthy Shares at different times or at different prices, such U.S. holder must determine its tax basis, holding period, and gain or loss separately with respect to each block of GrowHealthy Shares.

### *Information Reporting and Backup Withholding*

In general, information reporting requirements will apply to the Stock Consideration received by U.S. holders of GrowHealthy's Shares in the Proposed Transactions. Backup withholding (currently at a rate of 28%) may apply to such amounts if the U.S. holder fails to provide an accurate taxpayer identification number (generally on an IRS Form W-9) or is otherwise subject to backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or credit on a holder's U.S. federal income tax liability, provided the required information is timely furnished to the IRS.

## SUMMARY OF TERMS OF THE MCCRORY'S TRANSACTIONS

THE FOLLOWING SUMMARY OF TERMS IS QUALIFIED IN ITS ENTIRETY BY THE AGREEMENT REGARDING UNITS OF MCCRORY'S SUNNY HILL NURSERY, LLC, A COPY OF WHICH IS AVAILABLE HERE.[8]

### *Condition to Merger*

The Merger Agreements require that GrowHealthy acquire all of the outstanding membership interests of McCrory's Sunny Hill Nursery, LLC (the **"License Holder"**) prior to the closing of the Proposed Transactions. GrowHealthy through its wholly owned subsidiary GrowHealthty Farms, holds 75% of the License Holder. The remaining 25% is owned by Ward and Dolores McCrory (19%), Eve's Garden, Inc. (2%), AgriStarts, Inc. (2%), and Peckett's, Inc. (2%).

### *Ward and Dolores McCrory*

Ward and Dolores McCrory have agreed to exchange their ownership interest in the License Holder for 2,925,003 Shares of GrowHealthy (the **"McCrory's Exchange Shares"**) pursuant to an Agreement Regarding Units of McCrory's Sunny Hill Nursery, LLC, dated September 7, 2017 (the **"McCrory's Agreement"**).

In connection with the closing of the Proposed Transactions and the issuance of the McCrory's Exchange Shares to Ward and Dolores McCrory, GrowHealthy will offer to purchase up to 487,500 of the McCrory's Exchange Shares (the **"McCrory's Directed Redemption"**) and offer to purchase 769,385 of the McCrory's Exchange Shares pursuant to the Tender Offer (the **"Tender"**). Pursuant to the McCrory's Agreement, Ward and Dolores McCrory have the right to receive an aggregate amount of up to $1,587,573 in connection with the McCrory's Directed Redemption and the Tender and will, among other things: (a) enter into a Second Amended and Restated Operating Agreement of McCrory's that, among other things, will (i) reflect the change in ownership of the License Holder, (ii) name GrowHealthy Farms as the sole Cannabis Manager of the License Holder, and (iii) eliminate all of the governance restrictions

---

[8] https://khlawfirm.sharefile.com/share?#/view/s9f402d767b54769a

related to the Cannabis Division of the License Holder; (b) terminate the Advancement Agreement, dated July 1, 2015; (c) terminate the Escrow Agreement with P. Todd Kennedy, Esq., dated July 1, 2013; and (d) terminate the Security Agreement, dated July 1, 2015.

Upon obtaining appropriate regulatory approval, (a) McCrory's Bromeliad Nursery, LLC (the **"Bromeliad Nursery"**) and the License Holder will terminate the Nursery Contract Grower Agreement; (b) the Bromeliad Nursery, the License Holder, and Ward and Dolores McCrory will terminate the Security Agreement dated June 26, 2015; and (c) the License Holder will sell and transfer the Plant Inventory (as defined in the Nursery Contract Grower Agreement) to the Bromeliad Nursery or its designee for a purchase price of $1.00.

### *Eve's Garden, Inc., AgriStarts, Inc., and Peckett's, Inc.*

Eve's Garden, Inc., AgriStarts, Inc., and Peckett's, Inc. (collectively, the **"Two Percenters"**, and each individually, a **"Two Percenter"**), each hold 80 Units of the License Holder. At or prior to the closing of the Proposed Transactions, GrowHealthy intends to acquire the interests held by each Two Percenter, for 258,065 GrowHealthy Shares (the **"Two Percenters' Exchange Shares"**) pursuant to the proposed terms of Agreements Regarding Units of McCrory's Sunny Hill Nursery, LLC (the "**Two Percenter Agreements"**), which are still subject to negotiation.  GrowHealthy will permit the Two Percenters to participate in the Tender Offer on a pro-rata basis.  The Two Percenter Agreements will require the Two Percenters to enter into a Second Amended and Restated Operating Agreement of McCrory's that will (a) reflect the change in ownership of the License Holder, (b) name GrowHealthy Farms as the sole Cannabis Manager of the License Holder, and (c) eliminate all of the governance restrictions related to the Cannabis Division of the License Holder.

At the closing of the Proposed Transactions, and after giving effect to the Tender Offer, GrowHealthy will distribute to the Two Percenters their respective share of the Stock Consideration.

### *Interim Funding*

In order to obtain additional capital to satisfy certain capital expenditure requirements and otherwise meet certain deadlines imposed by the Florida Department of Health, prior to the closing of the Proposed Transactions, (a) GrowHealthy, GrowHealthy Farms, and GrowHealthy Properties have entered into a Secured Revolving Promissory Note (the "**Note"**) pursuant to which GrowHealthy, GrowHealthy Farms, and GrowHealthy Properties may borrow up to $2,000,000 from iAnthus, (b) GrowHealthy and GrowHealthy Properties have entered into a Pledge and Security Agreement, pursuant to which GrowHealthy has pledged the equity interests held by it in GrowHealthy Properties to iAnthus and GrowHealthy Properties has granted a security interest in substantially all of its assets to iAnthus to secure the obligations under the Note, and (c) GrowHealthy Properties has granted a mortgage in the Real Estate to iAnthus to secure the obligations under the Note.

### GROWHEALTHY'S MANAGEMENT

### *Directors and Executive Officers*

The following table and notes thereto lists the directors and executive officers of GrowHealthy, along with each such person's position.  All persons listed serve until the first to occur of their death, resignation, or removal, or until a successor to such person is elected or appointed, and qualified.  None of the persons listed has been involved in any bankruptcy proceeding, criminal proceeding, or other proceeding, material to an evaluation of the ability or integrity of such person in the five years preceding the date of this Memorandum.

| Name | Position(s) |
|------|-------------|
| Don Clifford | Manager, Director, and Chief Executive Officer |
| Craig Roberts | Director |
| Beverly Roberts | Director |
| Dr. Gerardo Aguirre | Director |
| Frankie Shroyer, Jr. | Director |
| Bradley Baran | Director |

*Principal Shareholders*

The following table sets forth and notes thereto set forth certain information with respect to the beneficial ownership of the Shares of GrowHealthy as of the date of this Memorandum by:

- each director of GrowHealthy;
- each named officer of GrowHealthy;
- each beneficial owner of more than 5% of the GrowHealthy Shares; and
- all directors and executive officers of GrowHealthy, as a group.

Beneficial ownership is determined in accordance with the rules of the SEC and generally includes voting or investment power with respect to securities, subject to community property laws, where applicable. The applicable percent ownership for each shareholder listed below is based on 47,588,708 Shares outstanding as of the date of this Memorandum. Unless otherwise noted, each of the persons listed below has sole voting and investment power with respect to his or her Shares and the address for each of our officers and directors listed below is 515 North Flagler Drive, Suite 1700, West Palm Beach, FL 33401.

| Beneficial Owner | Number | Percentage of all Shares Beneficially Owned |
|------------------|--------|---------------------------------------------|
| Craig & Beverly Roberts | 14,397,247 | 30.25% |
| Don Clifford | 3,298,624 | 6.93% |
| Worldwide Applications, LLC | 3,298,624 | 6.93% |
| Three WCG LLC | 7,218,435 | 15.17% |
| All officers and directors as a group | 32,112,930[9] | 67.48% |

---

[9] This total number of Shares includes (1) the 3,900,000 Shares owned by GGAT Investments, LLC, GS & GA Investments, LLC, and SVZA Investments, LLC, which collectively voted Dr. Gerardo Aguirre to the Board of Directors as their designee, (2) the 3,298,624 Shares owned by Worldwide Applications, LLC, which voted Frankie

*Redemption and Voting Agreements*

GrowHealthy has entered into Redemption and Voting Agreements (as amended) with each of the shareholders of GrowHealthy that have a right to designate a member of the Board of Directors pursuant to Section 7.14 of the LLC Agreement. These shareholders are Don Clifford, Craig and Beverly Roberts, Worldwide Applications, LLC, Three WCG LLC, and collectively, GGAT Investments, LLC, GS & GA Investments, LLC, and SVZA Investments, LLC. These shareholders collectively hold 67.48% of all currently outstanding GrowHealthy Shares, and pursuant to the Redemption and Voting Agreements (as amended) are required to vote to approve the Proposed Transactions.

Pursuant to the Redemption and Voting Agreement, dated August 18, 2017, by and between GrowHealthy and Craig and Beverly Roberts, GrowHealthy has agreed to (a) cause Don Clifford to execute a non-competition agreement with a restricted period of two years and a restricted area of the State of Florida; and (b) subject to the closing of the Proposed Transactions, cause Don Clifford to tender his resignation as an employee of GrowHealthy effective December 31, 2017, which resignation shall include Don Clifford's agreement that he will not accept employment with iAnthus in any capacity.

*Approval of Directed Redemption*

The Board of Directors has been advised by counsel to seek approval by the holders of a majority of Shares that are not parties to the Redemption and Voting Agreements. Accordingly, shareholders are being asked to consider and approve the Directed Redemptions.

GrowHealthy entered into the Redemption and Voting Agreements (as amended) to secure the agreement of the parties thereto to vote all GrowHealthy Shares FOR the Proposed Transactions and FOR an amendment to the LLC Agreement, which, among other things, eliminates Section 7.14 of the LLC Agreement, which requires all holders of GrowHealthy Shares to vote their GrowHealthy Shares to elect as a director the persons designated by (a) Don Clifford (1 director), (b) Craig and Beverly Roberts (2 directors), Worldwide Applications, LLC (1 director), Three WCG LLC (1 director), and GGAT Investments, LLC, GS & GA Investments, LLC, and SVZA Investments, LLC (collectively, 1 director).

The total Cash Proceeds from the Proposed Transactions will be up to $17.5 million, of which up to $15 million will be used to fund the Directed Redemptions and the Tender Offer (the **"Shareholder Redemption Pool"**). The allocation of the available Shareholder Pool between the Directed Redemption and the Tender Offer was developed with the intention to provide the two groups of shareholders with an opportunity to achieve liquidity from the Shareholder Pool which generally correlates with the percentage ownership of GrowHealthy Shares held by these two groups.

Accordingly:

- 60% of the Shareholder Redemption Pool will be allocated in the Directed Redemption, and the shareholders eligible to participate in the Directed Redemption collectively hold approximately 67% of the currently outstanding GrowHealthy Shares (without taking into account the issuances described on page 11 under the caption "Summary of Terms of the McCrory's Transactions"); and

- 40% of the Shareholder Redemption Pool will be allocated in the Tender Offer, and the shareholders eligible to participate in the Tender Offer collectively hold approximately 33%

---

Shroyer, Jr. to the Board of Directors as its designee, and (3) the 7,218,435 Shares owned by Three WCG LLC, which voted Bradley Baran to the Board of Directors as its designee.

of the currently outstanding GrowHealthy Shares (without taking into account the issuances described on page 11 under the caption "Summary of Terms of the McCrory's Transactions").

The Board of Directors believes the terms of the Directed Redemption are fair to GrowHealthy and requests that the holders of GrowHealthy Shares approve the Directed Redemption.

*Other Uses of the Cash Proceeds*

Up to $2.5 million of the Cash Proceeds will be used to pay indebtedness, transaction expenses, the fees and expenses of professional firms providing services to GrowHealthy and its subsidiaries, and other amounts approved by the Board of Directors, including a finder's fee of up to $475,000 to Brett Borgersen and Jay R. Jacknin.

## ADDITIONAL INFORMATION

GrowHealthy hereby extends to each shareholder the opportunity to ask questions of, and to receive answers from, officers of GrowHealthy concerning the Proposed Transactions and to obtain any additional information to the extent GrowHealthy possesses the same or can acquire it without unreasonable efforts or expense.  All communications or inquiries relating to this Memorandum to shareholders should be directed to:

GrowHealthy Holdings, LLC
515 North Flagler Drive
Suite 1700
West Palm Beach, FL 33401
Telephone No: (770) 329-9611
Fax No. (404) 812-3101
Attention: Don Clifford, CEO and Manager

**ATTACHMENT 1**
**TO**
**MEMORANDUM TO SHAREHOLDERS**

**Proxy**

Attached.



**PROXY**

**SOLICITED BY THE BOARD OF DIRECTORS OF GROWHEALTHY HOLDINGS, LLC**

**FOR THE SPECIAL MEETING OF SHAREHOLDERS TO BE HELD OCTOBER 10, 2017**

The undersigned hereby appoints Brian Brescia and Gerardo M. Balboni II, or either of them, with full power of substitution as proxies and attorneys-in-fact, to represent and to vote, as designated herein, all shares of limited liability company interest the (**"Shares"**) of GrowHealthy Holdings, LLC, a Delaware limited liability company (the **"Company"**), as to which the undersigned has sole or shared voting power, including without limitation all Shares: (a) Registered in the name of the undersigned (or any reasonable variant thereof); (b) of which the undersigned is a direct or indirect joint owner, including shares held with another person or persons as tenants in common, joint tenants, tenants by the entirety, JTWROS, or any other form of joint ownership; (c) held by any retirement plan or account (including any IRA) for the benefit of the undersigned; (d) held by any trust, limited partnership, limited liability company of which the undersigned is a settlor, beneficiary, trustee, general partner, member, or manager; or (e) held by any corporation of which the undersigned is an executive officer, at the Special Meeting of Shareholders of the Company to be held on October 10, 2017 at Hilton West Palm Beach, 600 Okeechobee Boulevard, West Palm Beach, Florida 33401, at 3:00 p.m. local time and at any adjournment thereof, on the matters set forth below:

       1.    To approve the Proposed Transactions with iAnthus Capital Management, LLC (as more fully described in the Memorandum to Shareholders, dated September 29, 2017), including (a) the merger of GHH Merger Company with iAnthus Merger Company, (b) the merger of GHH Management Company with iAnthus Merger Company, and (c) the sale of the real property owned by GrowHealthy Properties, LLC to iAnthus Real Estate Company.

| ☐ FOR | ☐ AGAINST | ☐ ABSTAIN |
|---|---|---|
| | mark one | |

       2.    To approve the redemption of a portion of the Shares held by GrowHealthy shareholders that have a right under Section 7.14 of the Limited Liability Company Agreement of the Company to designate a member of the Board of Directors.

| ☐ FOR | ☐ AGAINST | ☐ ABSTAIN |
|---|---|---|
| | mark one | |

       3.    In their discretion, upon such other matter or matters as may properly come before the meeting or any adjournment thereof.

**THE SHARES REPRESENTED BY THIS PROXY CARD WILL BE VOTED AS DIRECTED ABOVE. IF NO DIRECTION IS GIVEN AND THE PROXY CARD IS VALIDLY EXECUTED, THE SHARES WILL BE VOTED FOR ALL LISTED PROPOSALS AND IN THEIR DISCRETION, UPON SUCH OTHER MATTER OR MATTERS AS MAY PROPERLY COME BEFORE THE MEETING OR ANY ADJOURNMENT THEREOF.**

| | |
|---|---|
| Printed Name of Shareholder or person signing on behalf of a Shareholder | Signature of Shareholder or person signing on behalf of a Shareholder |
| Dated: _____ | |

### ATTACHMENT 2
### TO
### MEMORANDUM TO SHAREHOLDERS

**Reorganization Diagram**

Attached.



NOT A CERTIFIED COPY



# iAnthus – GrowHealthy: Reorganization Chart
## Current Structure

**Owner(s) of GHH**

**GrowHealthy Holdings, LLC ("GHH")**
Jurisdiction: Delaware
Taxation: Partnership

Owns 100% of the membership interests in GHP

**GrowHealthy Properties, LLC ("GHP")**
Jurisdiction: Florida
Taxation: Disregarded Entity
➤ Holds Lake Wales property

Owns 100% of the membership interests in GHF

GHF obtain 25% from second owner to own 100% of License Holder

**25% Owner**

**GrowHealthy Farms, LLC ("GHF")**
Jurisdiction: Florida
Taxation: Partnership
➤ Holds interest in License Holder

Owns 75% of the membership interests in License Holder

**McCrory's Sunny Hill Nursery, LLC ("License Holder")**
Jurisdiction: Florida
Taxation: Partnership
➤ Holds license from Florida DOH (Cannabis Dispensing Organization)

NOT A CERTIFIED COPY

# iAnthus – GrowHealthy: Reorganization Chart
## Reorganization Step 1

**GrowHealthy Holdings, LLC ("GHH")**
Jurisdiction: Delaware
Taxation: Partnership

**GrowHealthy Properties, LLC ("GHP")**
Jurisdiction: Florida
Taxation: Disregarded Entity
➢ Holds Lake Wales property

GHH, GHF and GHP all transfer all assets (except Lake Wales property, GHF's ownership of License Holder) to GH Merger Co, GHF's ownership of GHF, GHP, and GH Merger Co

**GrowHealthy Merger Co ("GH Merger Co")**
Jurisdiction: Florida
Taxation: Corporation

**GrowHealthy Farms, LLC ("GHF")**
Jurisdiction: Florida
Taxation: Partnership
➢ Holds interest in License Holder

**McCrory's Sunny Hill Nursery, LLC ("License Holder")**
Jurisdiction: Florida
Taxation: Partnership
➢ Holds license from Florida DOH (Cannabis Dispensing Organization)

NOT A CERTIFIED COPY

# iAnthus – GrowHealthy: Reorganization Chart

## Reorganization Step 1

NOT A CERTIFIED COPY

**GrowHealthy Holdings, LLC ("GHH")**
Jurisdiction: Delaware
Taxation: Partnership

**GrowHealthy Management Co ("GH Management Co")**
Jurisdiction: Florida
Taxation: Corporation

**GrowHealthy Farms, LLC ("GHF")**
Jurisdiction: Florida
Taxation: Partnership
➢ Holds interest in License Holder

**McCrory's Sunny Hill Nursery, LLC ("License Holder")**
Jurisdiction: Florida
Taxation: Partnership
➢ Holds license from Florida DOH (Cannabis Dispensing Organization)

GH Management Co and License Holder enter into Management Agreement. GH Management Co controls/operates License Holder in exchange for 100% of the gross profit, economic benefit, and economic risk. Option for GH Management Co to purchase all ownership interest in License Holder for $1,000, the license held by License Holder and/or all ownership interest in GHF.







